IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JAMIE HEATHER OKONSKI, | ) | Case No. 3:20-cv-1614 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER[1]** |
| Defendant. | ) | |

Plaintiff, Jamie Heather Okonski, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for supplemental security income ("SSI") under title XVI of the Social Security Act.  She contends the Administrative Law Judge ("ALJ") misevaluated both the opinion of her treating physician – Naghmana Masood, MD – and her subjective symptom complaints.  Because any error in the ALJ's evaluation of Dr. Masood's opinion was harmless; and because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Okonski's application for SSI must be affirmed.

## I.    Procedural History

Okonski applied for DIB on June 19, 2017.  (Tr. 216).[2]  As amended, Okonski alleged that she became disabled on June 5, 2017, due to: "1. Brugada Syndrome; 2. Heart Problem;

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 15.
[2] The administrative transcript appears in ECF Doc. 12.

3. Lung Disorder; 4. Emphysema; 5. Depression; 6. Anxiety Disorder; 7. Osteoarthritis in Back;

8. POTS; 9. Foot Problem; [and] 10. Migraines."  (Tr. 17, 231, 244).  The Social Security

Administration denied Okonski's application initially and upon reconsideration.  (Tr. 92-109,

111-29).  Okonski requested an administrative hearing.  (Tr. 152-54).

      ALJ Dianne S. Mantel heard Okonski's case on March 26, 2019 and denied the claim in a

June 20, 2019 decision.  (Tr. 17-35, 41-74).  In doing so, the ALJ determined that Okonski had

the residual functional capacity ("RFC") to perform light work, except:

> [Okonski] cannot climb ladders, ropes, or scaffolds; occasionally climb ramps and
> stairs and stoop; and frequently balance, kneel, crouch, and crawl.  With the
> bilateral upper extremities she can frequently handle and finger.  She can have
> occasional exposure to extreme heat and humidity along with dust, fumes, odors,
> gases, and other pulmonary irritants.  She cannot work around unprotected heights
> and unprotected moving mechanical machinery.  She cannot perform any
> commercial driving.  [Okonski] can understand, remember, and carry out simple
> and routine and detailed tasks, make judgments on work related actions, and
> respond appropriately to usual work situations and changes in a work setting that
> has occasional and expected changes.  [Okonski] cannot engage in direct public
> service work and can only be in proximity of the general public on an occasional
> basis.  She can have occasional interaction with supervisors and coworkers.

(Tr. 24-25).  Based on the vocational expert testimony that an individual with her age,

experience, and RFC could work in such representative occupations as linen grader, hand packer,

production worker, nut sorter, stone setter, and ampoule sealer, the ALJ determined that Okonski

wasn't disabled because she could perform a significant number of jobs in the national economy.

(Tr. 33-35).  On May 18, 2020, the Appeals Council denied further review, rendering the ALJ's

decision the final decision of the Commissioner.  (Tr. 1-3).  And on July 22, 2020, Okonski filed

a complaint to obtain judicial review.  ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Okonski was born on August 17, 1980, and she was 36 years old on the alleged onset date.  (Tr. 216).  She completed high school in May 1999 and had specialized training in office administration, which she completed in March 2010.  (Tr. 245).  She had past work as a cashier, stocker, and office worker, but he ALJ determined she had no past relevant work.  (Tr. 33, 246).

### B.    Relevant Medical Evidence

Okonski focuses her challenge upon the ALJ's consideration of the evidence and subjective symptom complaints regarding her physical impairments[3] at Step Four of the sequential evaluation (and not the handling of her mental health issues); thus, it is only necessary to summarize the medical and opinion evidence related to her physical impairments.  *See generally* ECF Doc. 16; ECF Doc. 19.

On February 3, 2017, Okonski visited Steven Bruhl, MD, for a follow up on her postural orthostatic tachycardia syndrome ("POTS").  (Tr. 458).  She reported dull, off-and-on chest pain and worsening palpitations.  *Id*.  Dr. Bruhl noted that Okonski's POTS had been well-controlled, her loop recorder showed no ventricular tachycardia episodes since insertion in August 2014, and her syncopal episodes had resolved.  (Tr. 458-59).  Dr. Bruhl stated that Okonski was "doing relatively well" from a cardiovascular standpoint and did not need any testing or changes to her medication.  (Tr. 460).

---

[3] The extent of Okonski's discussion of her mental health impairments is two pages of her brief, which summarizes a consultative psychologist's opinion; but the substantive sections of her brief raise no arguments concerning the ALJ's consideration of her mental impairments.  *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir. 2013); ECF Doc. 16 at 9-10; *see generally* ECF Doc. 16; ECF Doc. 19.

3

On April 6, 2017, Okonski visited her primary care physician, Naghmana Masood, MD, to – among other things – request a referral to a pulmonologist.  (Tr. 383, 458).  Dr. Masood noted that she had a history of chronic obstructive pulmonary disease ("COPD") and chronic headaches.  (Tr. 384, 387).  Dr. Masood diagnosed her with COPD and occipital neuralgia and issued referrals for neurology and pulmonology treatment.  (Tr. 387).

On May 15, 2017, Okonski visited neurologist Paul Gregory Smyth, MD, for her headaches.  (Tr. 433).  Okonski reported getting headaches two to three times per week, that lasted from hours up to three days.  *Id.*  The pain often began in the back of her neck and involved throbbing, severe pain with photophobia, nausea, and vomiting.  *Id.*  Triggers included winter cold, stress, and bright light.  *Id.*  Okonski also reported four lung collapses with her COPD in the past but continued to smoke.  *Id.*  Dr. Smyth diagnosed Okonski with headaches (tension/migraine spectrum), ordered imaging tests, and prescribed Neurontin for prophylaxis. (Tr. 435).

On June 1, 2017, Okonski presented to Raheel Jamal, MD, for a pulmonary consult regarding her COPD and history of bilateral pneumothorax.  (Tr. 425).  Okonski's medical history indicated she'd had no pneumothorax since undergoing surgery in 2010.  *Id.*  However, she had intermittent dyspnea on exertion, chronic allergies, nasal congestion, and post-nasal drip. *Id.*  Upon examination, Okonski was not in respiratory distress, her chest was clear upon auscultation, she had no wheezing, rales, or rhonchi, and she had symmetric air entry.  (Tr. 427).

Dr. Jamal reviewed an October 2, 2013 pulmonary function test and an April 2, 2015 CT scan.  (Tr. 431).  The pulmonary function test showed normal spirometry, diffusing capacity, and airway resistance.  *Id.*  It was an "[o]verall normal study" except for a borderline bronchospastic component suggestive of asthma.  *Id.*  The CT scan showed no evidence of acute pulmonary

embolus or aortic pathology, probable underlying bronchitis, small right upper lobe pneumonia, and biapical bleb formation.  *Id*.  Dr. Jamal assessed Okonski with COPD, unspecified type, and history of pneumothorax.  *Id.*

On June 26, 2017, Okonski returned to Dr. Smyth for a follow up, reporting that her headaches were "better on Neurontin" but the third dose made her feel unwell "in a hard to describe way."  (Tr. 421).  Upon physical examination, she was in no acute cardiorespiratory distress, had normal neurological exam, and had normal gait.  (Tr. 423).  Dr. Smyth continued Neurontin and scheduled a follow up, noting that Okonski's neurologist was managing her Brugada syndrome.  (Tr. 424).

On July 16, 2017, Okonski presented to the emergency room with swelling in her right hand and right shoulder pain rated at 5/10.  (Tr. 416).  The pain had begun the week before, starting in the second MCP joint of her right hand and progressing to the third MCP joint, with discomfort indicating a median nerve distribution of the right hand with some pain and numbness.  *Id.*  She then started having pain in the lateral aspect of the deltoid region.  *Id.*  Upon examination, Okonski had full range of motion and strength, normal chest effort, minimal right acromioclavicular joint tenderness, subtle swelling on the dorsal aspect of the second and third MCP joint, and tenderness in the right superior trapezius.  (Tr. 417-18).  An x-ray of Okonski's right hand was normal.  (Tr. 418).  She was diagnosed with right hand pain and acute right shoulder pain, referred to Dr. Masood, and discharged the same day with ibuprofen and Norco prescriptions.  (Tr. 419-20).

On July 24, 2017, Okonski visited Norwest Ohio Orthopedics & Sports Medicine for an initial evaluation.  (Tr. 747).  Okonski had been referred to therapy for wrist "cock up brace s[ec]ondary to CTS diagnosis."  *Id.*  Okonski reported right hand numbness and pain, wrist pain,

pain with gripping and squeezing, an inability to grasp, and weakness that would result in dropping items. *Id.* She rated her pain as 3/10 on average and 5/10 at worst, describing it as sharp off-and-on pain that increased with activity and decreased with heat. *Id.* Upon evaluation, Okonski's right hand/wrist: (1) flexion was 50°; (2) extension was 70°; and (3) ulnar/radial deviation, pronation, and supination were within normal limits. (Tr. 748). Her right-hand grip strength was 50% that of her left, and she had negative Tinel's exam and positive Phalen's compression test. (Tr. 748-49). Courtney Thobe, PT, assessed Okonski with right hand pain and carpal tunnel syndrome, provided her a wrist splint, and provided instructional guidance. (Tr. 749).

On August 1, 2017, Okonski returned to Dr. Masood, who noted she had a chronic weight loss problem, weighing 86 pounds at the time of the visit. (Tr. 668-69). Okonski had been treating her weight loss with Remeron but had been noncompliant with medication. (Tr. 668). She also reported numbness in the second and third digit. *Id.* Okonski's physical examination results of her respiratory cardiovascular systems were normal. (Tr. 670). Dr. Masood assessed her with weight loss and prescribed trazodone and Remeron. *Id.*

On August 22, 2017, Okonski underwent a cardiac stress test. (Tr. 649). Prior to testing, she reported chest discomfort in her left upper chest rated at 3/10. *Id.* During a treadmill exercise, Okonski ran for 8:41 minutes, which she terminated due to shortness of breath, fatigue, and leg pain. (Tr. 649-50). She scored an 8, which correlated to a low risk of coronary artery disease. (Tr. 651). Imaging tests showed: (1) largely normal perfusion imaging with soft tissue artifact but without evidence of significant myocardial ischemia or infarction; (2) normal global left ventricular systolic function without regional wall motion abnormalities; and (3) significant

electrocardiographic evidence of myocardial ischemia without significant associated arrhythmias.  (Tr. 650-51).

On September 11, 2017, Okonski presented to Northwest Ohio Orthopedics & Sports Medicine and was seen by Robert Steiner, MD.  (Tr. 728).  She reported sharp, 4/10 off-and-on pain in the MCP joints of her right index and long fingers that would not go away with medication.  *Id.*  She also reported intermittent numbness and tingling along the radial aspect of the right hand, with occasional feelings of total numbness.  *Id.*  She also started feeling soreness in her left index finger MCP joint.  *Id.*  She felt no night symptoms when she wore her brace.  *Id.* Upon physical examination of the right hand, Okonski had mild tenderness over the right index and long finger MCP joints; intact baseline sensory median, ulnar, and radial nerve distribution; negative Tinel test; mildly positive median nerve compression test; 4/5 grip strength; and mild pain with wrist range of motion.  (Tr. 730).  Her left hand was normal except for mild soreness over the left index MCP joint.  (Tr. 730-31).  Dr. Steiner diagnosed Okonski with right hand pain and ordered physical therapy.  (Tr. 731).

On September 12, 2017, Okonski went to the emergency room with chest and abdominal pain.  (Tr. 679).  She denied respiratory, neurological, or musculoskeletal symptoms.  (Tr. 681). Her physical exam and chest x-ray results were normal.  (Tr. 681-82).  She received morphine and Ativan, after which she reported no pain and was discharged.  (Tr. 682-83).

On September 18, 2017, Okonski visited Jana Lortz, OTRL, for an initial occupational therapy evaluation.  (Tr. 742).  Okonski reported that sweeping caused pain in her right hand that would radiate into her shoulder, and she had numbness and tingling when she overworked the right hand.  *Id.*  Her finger pain was rated at 0/10 at best, 4/10 on average, and 6/10 at worst.  *Id.*

She also reported functional limitations, including opening jars and running "the sweeper."  (Tr. 742-43).

Upon examination, Okonski's left hand/wrist had: (1) 20° flexion; (2) 75° extension; (3) 25° radial deviation; (4) 90° pronation; and (5) 85° supination.  (Tr. 743).  Her left index finger had 90° MCP joint range of motion, 95° PIP joint range of motion, and 75° DIP joint range of motion.  *Id.*  Her left long finger had 90°, 96°, and 80° range of motion in those joints, respectively.  *Id.*  Okonski's right hand had: (1) 60° flexion; (2) 20° extension; (3) 30° ulnar deviation; (4) 16° radial deviation; (5) 90° pronation; and (6) 80° supination.  (Tr. 743-44).  Her index and long fingers had 83° MCP joint range of motion, 95° PIP joint range of motion, and 51/52° DIP joint range of motion.  (Tr. 744).  She had negative Tinel's exams and Phalen's compression tests.  *Id.*  Occupational Therapist Lortz assessed Okonski with left wrist pain, left hand joint pain, right hand pain, and carpal tunnel syndrome.  (Tr. 746).  During therapy treatment, Okonski demonstrated impaired range of motion and strength.  *Id.*  Treatment goals were set for two and four weeks.  (Tr. 745).

Okonski returned to Lortz the next day, reporting 2/10 pain with the right hand and that she felt "okay" after her last physical therapy treatment.  (Tr. 739).  A strength test showed 41-pound grip strength with the left and 17 pounds with the right.  *Id.*  Two-point pinches were 5.5 on the left and 4.5 on the right; three-point pinches were 9 on the left and 4.5 on the right; and key pinches were 9.5 on the left and 9 on the right.  *Id.*

On September 26, 2017, Dr. Jamal performed a pulmonary function test, which showed normal spirometry without evidence of obstruction.  (Tr. 673).  Diffusion capacity was increased, which suggested asthma, but clinical correlation was required.  *Id.*

8

On October 9, 2017, after not attending occupational therapy since September 19, 2017, Okonski visited Dr. Steiner for a follow up. (Tr. 724, 738). Okonski reported right hand pain, but no further numbness. (Tr. 724). Okonski's physical exam results were unchanged. (Tr. 726). Dr. Steiner diagnosed Okonski with right hand pain and right-hand synovitis and tenosynovitis. (Tr. 727). Dr. Steiner noted that an autoimmune workup came back negative, suggesting Okonski had synovitis of the MCP joins versus tendinitis of the extensors and recommended an MRI. *Id.*

Okonski received an MRI of her right hand on October 12, 2017, which was unremarkable except for "very minimal fluid in the flexor tendon sheaths of the index and middle fingers." (Tr. 1003-04). The interpreting physician noted that "[t]hese are subtle findings and could represent early tenosynovitis." (Tr. 1004).

On December 2, 2017, Okonski presented to the emergency room with right-sided chest pain. (Tr. 943). A physical examination gave normal results, except for tenderness in the chest. (Tr. 947). An EKG revealed no acute ischemic changes and she felt better upon recheck. (Tr. 949). She was discharged with a prednisone prescription. (Tr. 949-50).

On December 19, 2017, Okonski visited Dr. Masood, reporting feeling sick and tired and a sore throat. (Tr. 758). Her physical examination results were normal. (Tr. 761). Dr. Masood assessed her with, among other things, bronchitis and prescribed amoxicillin. *Id.* Okonski's medical list also indicated she started on Depakote. (Tr. 764).

On January 18, 2018, Okonski visited Dr. Masood for a medication check for Depakote, stating she had been too nervous to start taking it. (Tr. 763). A review of symptoms was negative for cardiovascular, respiratory, or neurologic symptoms. (Tr. 765). Her physical

examination results were also normal.  (Tr. 766).  Dr. Masood prescribed Vitamin D tablets.  (Tr. 766-67).

On September 6, 2018, Okonski visited podiatrist Kimberly Smith, DPM, reporting right foot and ankle pain that rendered her unable to do daily activities.  (Tr. 788).  Okonski stated the pain was most severe with walking.  (Tr. 788-89).  A vascular exam revealed edema on her right foot.  (Tr. 790).  A musculoskeletal exam showed antalgic gait, 4/5 strength, pain with palpation, and ankle and STJ pain upon movement.  *Id*.  Dr. Smith diagnosed Okonski with peroneal tendonitis of the right leg, tibialis posterior tendinitis, ankle pain, and foot pain, and started Okonski on rest, ice, elevation, and a brace.  (Tr. 790-91).

On September 6, 2018, Okonski also presented to Josiah Parkhurst, PT, for an initial evaluation.  (Tr. 792-95).  Okonski reported that a month before, she stood up and felt her ankle give out, which had happened twice before.  (Tr. 792).  She stated she could walk about 1.5 hours at a relaxed pace and 1 hour at a brisk pace before she felt increased pain.  (Tr. 792-93).  She reported 2/10 pain on average, 8/10 pain at its worst, and 0/10 pain at its best.  (Tr. 793).  Her pain increased with activity, sitting, standing, and walking, and limited her ambulation and stair navigation.  *Id.*  Upon evaluation, Okonski had normal range of motion with both ankles.  *Id.*  Physical Therapist Parkhurst assessed Okonski with difficulty walking, peroneal tendinitis, tibialis posterior tendinitis, ankle pain, and foot pain, noting that she presented with impaired pain and balance, and provided a small ankle stabilizing orthosis.  (Tr. 794).

On September 14, 2018, Okonski visited the emergency room with bilateral ear pain, pharyngitis, headache, and nasal congestion.  (Tr. 967).  Her physical exam results were normal.  (Tr. 967-68).  She was diagnosed with acute pharyngitis and acute suppurative otitis media of both ears without spontaneous rupture and prescribed medication.  (Tr. 970).

10

On October 3, 2018, Okonski returned to Dr. Bruhl for a follow up on her Brugada Syndrome and POTS, stating she had been doing "ok" but had nausea and dizziness in the evenings and was sometimes fatigued with sobbing.  (Tr. 976).  She also reported lightheadedness and racing heart, but both were mild and not limiting.  *Id.*  Her physical examination was normal except for appearing "very thin."  (Tr. 979).  Dr. Bruhl diagnosed Okonski with POTS, Brugada Syndrome, and bifascicular block.  (Tr. 980).  He continued Florinef to treat Okonski's POTS, noting that she had to take extra time when moving from lying to sitting, sitting to standing, and standing to walking.  *Id.*  Dr. Bruhl found no dangerous arrhythmias on her loop recorder, and the bifascicular block was asymptomatic.  *Id.*

On November 12, 2018, Okonski presented to the emergency room with ear pain and sore throat after babysitting family over the weekend, who had similar symptoms and fever.  (Tr. 991-92).  Upon examination, Okonski had normal cardiovascular, pulmonary, and neurological exam. *Id.*  She was diagnosed with acute pharyngitis and acute upper respiratory infection.  (Tr. 995).

On January 9, 2019, Okonski underwent an MRI of the right ankle and foot.  (Tr. 1006, 1010).  The right ankle MRI showed improvement with small ankle joint effusion, with resolved patchy areas of bone marrow edema distal tibia diaphysis; unchanged chronic grade I sprain with thinning in the anterior talofibular ligament; new acute grade I sprain with edema deep fiber in the deltoid ligament; fluid along the extensor retinaculum; and mild posterior tibial tendinosis. (Tr. 1007-08).  The foot MRI showed moderate effusion at the first metatarsophalangeal joint and paramagnetic artifact dorsal aspect fifth metatarsal head.  (Tr. 1011).

On January 14, 2019, Okonski presented to the emergency room with migraine headaches.  (Tr. 1059).  Her physical examination results were normal.  (Tr. 1063).  The treating physician diagnosed Okonski with migraine without status migrainosus and discharged her the

same day, noting that Okonski was neurologically and neurovascularly intact and her symptoms resolved themselves.  (Tr. 1065).

On January 22, 2019, Okonski visited Emily Kusmer, PT, for a physical therapy evaluation.  (Tr. 1041-46).  Okonski reported right foot and ankle pain that was worsened with standing and walking, and her ankle would give out if she walked too far.  (Tr. 1042).  She reported 5/10 average pain, 10/10 pain at its worst, and 1/10 pain at its best.  *Id.*  She also reported functional limitations with activities of daily living, stair navigation, and recreation.  *Id.* Upon examination, she had normal knee range of motion; normal ankle gait; mild right ankle swelling with tenderness to palpation; 5/5 strength on plantar flexion and dorsiflexion but 4/5 in inversion and eversion.  (Tr. 1043-44).  Her ankle range of motion was: 35° inversion and plantar flexion; 30° eversion; and 5° dorsiflexion.  (Tr. 1043).  Physical Therapist Kusmer noted that Okonski had impaired pain, muscle strength, and balance associated with her leg and foot diagnoses and recommended six weeks formal therapy.  (Tr. 1045-46).

Okonski began physical therapy on January 25, 2019 and continued through March 6, 2019.  (Tr. 1016-40).  On March 6, 2019, Okonski was discharged after completing almost all the goals of her therapy.  (Tr. 1016-18).  The achieved goals were: (1) 1/10 pain; (2) increased range of right ankle motion; (3) non-antalgic gait; (4) independence with home exercise; and (5) ability to ambulate up to 20-25 minutes without increase in right ankle pain.  (Tr. 1017).   Her right ankle and foot range of motion was 39° on inversion, 19° on eversion, 13° on dorsiflexion, and 43° on plantar flexion.  (Tr. 1016).  Her strength was 5 on plantar flexion, inversion, and eversion, and 4 on dorsiflexion.  *Id.*  Okonski reported doing "real well and can go up and down stairs alternating and has not been having any difficulty with grocery shopping."  (Tr. 1019).

### C.      Relevant Opinion Evidence

Dr. Masood completed an undated physical assessment that was sent to the Social Security Administration on August 3, 2017, consisting of checked boxes, filled-in blanks, and circled responses.  (Tr. 599-601).  He listed Okonski's pneumothorax and POTS and checked "seldom" to indicate her symptoms would "seldom" be severe enough to interfere with the attention and concentration required to perform work-related tasks.  (Tr. 600).  Of her medications, Dr. Masood stated metoprolol would cause side effects that would impact her ability to work.  *Id.*

Dr. Masood opined that Okonski could walk less than 1 block without rest or significant back pain; sit/stand/walk for 1 hour in an 8-hour workday; occasionally lift less than 10 pounds; and never lift more than 10 pounds.  *Id.*  Okonski needed 4 to 5 unscheduled, 20-minute-long breaks in an 8-hour workday.  *Id.*  Dr. Masood also opined that Okonski had manipulative limitations, indicating she could use both hands and her left arm 30% of the time, her right-hand fingers 10% and arms 20% of the time, and her left-hand fingers 5% of the time.  *Id.*  He checked a blank indicating that Okonski would likely be absent more than four times per month.  (Tr. 601).  And he stated that Okonski's impairments were reasonably consistent with the symptoms and limitations espoused in his opinion.  *Id.*

### D.      Relevant Testimonial Evidence

At the ALJ hearing, Okonski testified that she lived with her mother and 17-year-old son in a mobile home.  (Tr. 50).  She spent her time at home, mostly doing "nothing."  (Tr. 59).  She sometimes did light housework, cleaned, watched television, ran errands, and paid bills.  (Tr. 60).  She had no problem doing household chores, except in the morning when she woke up.  (Tr. 52).  Some days, she could sweep, mop, and wash dishes but other days her tendonitis

interfered with her ability to grip.  (Tr. 52, 61).  Okonski, could drive, but long distance caused problems with her right foot.  (Tr. 48-49).  She occasionally walked, but her foot and back would start to bother her after an hour or two.  (Tr. 51).  Okonski had two grandchildren, a 3-year-old, and a 10-month-old, whom she occasionally watched.  (Tr. 52, 60-61).  Okonski did not pick up the 3-year-old due to the child's weight.  (Tr. 61).

Okonski testified she used inhalers, but during the summer she used a breathing machine three times per week.  (Tr. 53).  She tried to avoid physical activity due to her heart.  (Tr. 54).  She had off-and-on dizziness once/twice per week with activity.  (Tr. 54-55).  If she became too active, or stood or walked for over half an hour, her heart would race, and she would need to sit down.  (Tr. 55, 64-65).  She also had random chest pain up to 3 times per week, lasting up 15 minutes.  (Tr. 62).  She hadn't been to the emergency room for chest pain in a while because it had been resolving itself.  (Tr. 63).

Okonski testified she had panic attacks often, especially when she went out for too long, got irritated, or felt nervous.  (Tr. 57).  She took medication but didn't feel any different when it was changed the year before.  (Tr. 59).  She also suffered daily migraines, lasting between a few minutes to weeks.  (Tr.65).  Okonski testified she could lift up to 15 pounds safely, but her tendonitis sometimes made that not possible.  (Tr. 65).

## III.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154

(2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation marks omitted).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it is not necessary that this court agree with the Commissioner's findings," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B.      Step Four: Evaluation of Dr. Masood's Physical Assessment

Okonski argues that the ALJ failed to apply proper legal standards or reach a decision supported by substantial evidence in her evaluation of Dr. Masood's physical assessment.  ECF Doc. 16 at 11-18; ECF Doc. 19 at 1-2.  Okonski argues the ALJ gave inadequate reasons for discounting Dr. Masood's opinion because: (1) his assessment was supported by the evaluations of physicians to whom he referred Okonski, and which had been forwarded to him; (2) Okonski's ability to occasionally care for her grandchildren did not contradict the limitations expressed in Dr. Masood's opinion; (3) Okonski's belief that she could walk one hour at a brisk pace did not contradict Dr. Masood's opinion, and the ALJ mischaracterized the evidence of that belief; (4) the ALJ failed to explain how meeting physical therapy goals related to her ankle contradicted Dr. Masood's opinion regarding the limitations attributable to her pneumothorax and POTS; (5) the ALJ ignored evidence of her diminished hand strength and flexibility; and (6) the ALJ could not discount Dr. Masood's opinion based on the medication prescribed, because the record showed she was prescribed narcotics throughout the relevant period, and the evidence the ALJ cited did not support the ALJ's reason.  ECF Doc. 16 at 11-18; ECF Doc. 19 at 1-2.  Okonski argues the error was harmful because Dr. Masood opined that Okonski required breaks in excess of what the vocational expert testified would be tolerated by employers.  ECF Doc. 16 at 18.

The Commissioner disagrees, arguing the ALJ's reasons for discounting Dr. Masood's physical assessment were legitimate and reasonably drawn from the record.  ECF Doc. 18 at 10-12.

16

### 1.    Medical Opinion Standard

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 416.920(e).  The regulations applicable to the evaluation of Okonski's claim provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)."  20 C.F.R. § 416.920c(a).  Nevertheless, an ALJ must "articulate how [she] considered the medical opinions and prior administrative medical findings" in adjudicating a claim.  *Id.*  In doing so, the ALJ is required to explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 416.920c(b)(2).  If the ALJ finds that two or more medical opinions "are both *equally well-supported and consistent* with the record but are not exactly the same," the ALJ must then articulate what factors were most persuasive in differentiating the opinions.  20 C.F.R. § 416.920c(b)(2) (internal citations omitted) (emphasis added).  Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 416.920c(c)(3)-(5).  Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other sources, whereas supportability concerns the relevancy of objective medical evidence and degree of explanation given by the medical source to support the limitations assessed in the opinion.  *See* 20 C.F.R. § 416.920c(c)(1)-(2).

### 2.    Analysis

The ALJ failed to fully comply with regulatory requirements in her evaluation of Dr. Masood's physical assessment.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ found

Dr. Masood's physical assessment of Okonski "unpersuasive" because Dr. Masood's own examination findings did not support the restrictive limitations he opined.  (Tr. 32-33).  The ALJ specifically cited Dr. Masood's exam findings that: Okonski's breath sounds were unlabored; she had normal spirometry findings; she had normal extremity test findings with no cyanosis, clubbing, or edema noted; and she appeared in no acute distress during an August 2017 exam.  (Tr. 32); *cf.* (Tr. 670, 677).  The ALJ further cited: Okonski's testimony that she could babysit occasionally and help with her cousin's children while shopping; Okonski's statements in treatment notes that she could walk one hour at a brisk pace before experiencing pain; and she planned to go to Walmart after a physical therapy session and do "a lot of walking."  (Tr. 32-33); *cf.* (Tr. 51-52, 60-61, 793, 1034).  The ALJ also cited physical therapy notes stating that Okonski had met the goals of physical therapy with reduced pain and improved mobility in the right ankle; treatment notes showing negative Tinel's test, full grip and 4/5 strength in Okonski's right hand, and full strength in her left hand; and Okonski's statements to Dr. Masood that she was not taking medication.  (Tr. 33); *cf.* (Tr. 667, 726, 1017).

The record makes it clear that the ALJ complied with the regulatory requirement to consider and discuss the supportability of Dr. Masood's opinion.  20 C.F.R. § 416.920c(b)(2).  This is true even though it is also true that other record evidence may arguably *support* Dr. Masood's opinion.  *See O'Brien*, 819 F. App'x at 416.  For example, although the ALJ pointed out that Okonski told Dr. Masood in August 2017 that she was "not taking medication," Dr. Masood's notes from that same visit listed prescribed medications to treat Okonski's respiratory and cardiac symptoms.  (Tr. 667-68).  In addition, as noted by the ALJ, Dr. Steiner's October 9, 2017 treatment notes stated that Okonski was taking several medications, including hydrocodone-acetaminophen.  (Tr. 724-25).  Further, Dr. Masood's opinion that Okonski's

POTS and pneumothorax diagnoses restricted her to sitting/standing/walking 1 hour in an 8-hour workday isn't necessarily contradicted by Okonski's ability to walk briskly for an hour.  (Tr. 33, 600, 793).  However, as noted above, even if a preponderance of the evidence had supported Okonski's position on the supportability of Dr. Masood's opinion, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ."  *O'Brien*, 819 F. App'x at 416.  Here, it does, as stated above.

The regulation for evaluating opinion evidence not only requires the ALJ to discuss the extent to which the medical source's own objective findings *support* the opinions of the medical source, it also requires the ALJ to explain how *consistent* the source opinion is with evidence from other medical and nonmedical sources.  20 C.F.R. § 416.920c(b)(2).  Although, as just discussed, the ALJ explained how she assessed the supportability of Dr. Masood's opinion, nothing in the ALJ decision can be construed as an express explanation of the whether Dr. Masood's opinion was consistent or inconsistent with other medical and nonmedical source evidence.  At best, the ALJ commented on treatment notes from other medical sources which contained information that was apparently contrary to Dr. Masood's opinion.  For example, the ALJ stated, "objective findings in the treatment record reflect a negative Tinel's test, full grip and 4/5 strength in her right hand and full strength in her left hand, all of which suggest the claimant does not have such restrictive limitations in her ability to grasp, twist, turn, reach, and perform fine manipulation tasks with her upper extremities."  (Tr. 33).  Although the ALJ is not required to incorporate into "single tidy paragraph[s]" the different parts of the required regulatory analyses, a more obvious discussion would have helped the court conduct its review.  *Mitchell v. Comm'r of Soc. Sec.*, No. 1:19-cv-1401, 2020 U.S. Dist. LEXIS 48401, at *39 (N.D. Ohio Mar. 12, 2020); *see also Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th

Cir. 2010) (explaining that a reviewing court reads the ALJ's decision "as a whole and with common sense").  As it stands, it is not all that apparent that the ALJ did consider the consistency of Dr. Masood's opinions with the evidence of other medical sources and nonmedical sources.  This omission constituted a failure on the part of the ALJ to provide a "coherent explanation for h[er] reasoning" sufficient to allow us to understand how the ALJ arrived at her conclusion and conduct meaningful judicial review.  *Lester v. Saul*, No. 5:20-cv-01364, 2020 U.S. Dist. LEXIS 247187, at *40 (N.D. Ohio Dec. 11, 2020); *Fleischer*, 774 F. Supp. 2d at 877; *see also Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

Despite the foregoing, the court concludes that the ALJ's incomplete explanation of her evaluation of Dr. Masood's opinion was harmless.  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009).  Once an ALJ determines that a medical source opinion is unpersuasive because it was not supported by the source's own examination findings – and provides a coherent explanation for why – any failure to also explain the whether the source's opinion was consistent with other medical and nonmedical source evidence is necessarily harmless.  Lack of supportability alone is a basis for finding a source opinion to be unpersuasive. *See Richardson v. Saul*, No. 20-cv-489, 2021 U.S. Dist. LEXIS 161602, at *29 (D. N.H. Aug. 26, 2021) (noting that a persuasiveness finding based solely on consistency grounds would have been sufficient for the ALJ to find a medical source's opinion less persuasive); *Baca v. Saul*, No. 20-225, 2021 U.S. Dist. LEXIS 70814, at *17-18 (D. N.M. Apr. 13, 2021) (stating that an ALJ's supportability finding would have been sufficient to reject a source's opinion even if the consistencies the ALJ discussed were not).  Moreover, Okonski has not drawn the court's attention to other *consistent* medical source evidence that could somehow bolster Dr. Masood's unsupported opinion. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (An

error in weighing medical opinions is harmless when "the Commissioner has met the goal of [the regulations] – the provision of the procedural safeguard of reasons."); *see also DeBerry v. Comm'r of Soc. Sec. Admin.*, 352 F. App'x 173, 176 (9th Cir. 2009) (Insufficient reason was harmless when the ALJ gave other, legitimate reasons for discounting an opinion).  Thus, any shortcoming in the ALJ's compliance with 20 C.F.R. § 416.920c provides no basis for remand.

## C.    Step Four: Consideration of Okonski's Subjective Symptom Complaints

Okonski argues that the ALJ failed to apply proper legal standards in her evaluation of Okonski's subjective symptom complaints.  ECF Doc. 16 at 18-20; ECF Doc. 19 at 3-4. Specifically, Okonski contends the ALJ failed to comply with SSR 16-3p by not providing clearly specific reasons for why Okonski's statements about the severity of her symptoms were not consistent with the evidence.  ECF Doc. 16 at 19-20.

The Commissioner responds that the ALJ properly evaluated Okonski's subjective symptom complaints because – as a whole – the ALJ's decision recognized and discussed evidence pertaining to the relevant factors (testimony and treatment notes discussing her activities of daily living, symptoms, and course of treatment).  ECF Doc. 18 at 12-14.

### 1.    Subjective Symptom Evaluation Standard

The ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 416.920(e).  The RFC represents the *most* that a claimant can do on a "regularly and continuing basis," despite her impairments.  SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) ("Regular and continuing basis" means 8 hours a day, 5 days a week or equivalent.); *see also Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011).  A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms.  *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th

Cir. 1989).  If an ALJ discounts or rejects a claimant's subjective complaints, she must clearly state her reasons for doing so.  *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  Specifically, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess" how the ALJ evaluated the claimant's symptoms.  SSR 16-3p, 2016 SSR LEXIS 4 *26 (Mar. 16, 2016).

### 2.    Analysis

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in her evaluation of Okonski's subjective symptom complaints.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ's evaluation of Okonski's subjective symptom complaints began with a recitation of her hearing testimony and the following boilerplate conclusion:

> After careful consideration of the evidence, the undersigned finds that [Okonski's] medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. 25-26).  What followed that conclusion was not so much the promised explanation as an extensive summary of the record evidence, the opinion evidence, and concluding remarks.  (Tr. 26-33).  The ALJ made only a passing reference to the "requirements of . . . SSR 16-3p" without any discussion—expressed or implied—of which factors were implicated by the evidence.  SSR 16-3p, 2016 SSR LEXIS 4 *18-19; 20 C.F.R. § 416.929(c)(3); (Tr. 25-33).  Nevertheless, the court is not to examine the ALJ decision on a granular basis, evaluating whether each section is written the way the court might prefer.  Instead, we are to be mindful that the ALJ isn't required to package her explanation of a particular issue into a single, tidy paragraph; rather, and it bears

repeating, the ALJ's decision is read "as a whole and with common sense." *Buckhannon ex rel. J.H.*, 368 F. App'x at 678-79.

Read in that way, the court concludes that the ALJ's conclusion that Okonski's subjective symptom complaints were not entirely consistent with the medical and other evidence in the record was sufficiently stated and supported by substantial evidence. Okonski described limitations that included: (1) Dr. Smith's statement that she should drive in-town only; (2) the need to use a breathing machine "in the summer approximately three times weekly" after being diagnosed with COPD and black spots on her lungs; (3) the daily use of inhalers at various times of the day; (4) her use of a cardiac loop recorder; (5) once or twice weekly experiences of dizziness, increased heart rate and decreased blood pressure, which gets worse upon activity or sitting or standing too long; (6) chest pains lasting 10-15 minutes two to three times weekly; (7) exacerbated foot and back pain after walking some distances; (8) difficulty lifting weight of approximately 19 pounds (the weight of a grandchild) and sometimes even lifting a gallon of milk; (9) trouble gripping; and (10) side effects from some of her medicines. (Tr. 25-26); *see also* (Tr. 49-54, 61-62, 64-66).

Intertwined within the ALJ's discussion of the medical and nonmedical evidence were the following findings that would be inconsistent with Okonski's stated limitations: (1) no issues performing household chores, though some days are better than others; (2) the ability to watch television programs; (3) the ability to attend her son's school meetings relating to his IEP learning program; (4) her ability to help watch grandchildren; (5) Dr. Bruhl's findings that: Okonski's POTS was fairly well controlled, her loop recorder revealed no heart problems since implantation, and her examination findings were largely unremarkable; (6) essentially normal findings in a visit with Dr. Masood in April 2017; (7) a low-risk finding on a cardiac stress test

conducted in August 2017; (8) her ability to use a computer and share household duties with her mother; (9) normal spirometry test results generated by Dr. Jamal; (10) her report to a physical therapist that she could walk 1.5 hours at a relaxed pace and 1 hour at a brisk pace before experiencing 2/10 ankle pain; (11) Dr. Bruhl's essentially normal test findings in October 2018; (12) her ability to plan on "doing a lot of walking at Walmart"; (13) medical source findings by the state agency medical consultants indicating Okonski's ability to perform light work; (14) Dr. Masood's findings that Okonski had unlabored breath sounds, normal spirometry test results, and normal extremity examination findings; (15) notes of her improvement with physical therapy; and (16) the ability to walk 20-25 minutes without increase in ankle pain.  (Tr. 26-30); *see also* (Tr. 52, 60-61, 103-05, 108, 122-24, 127, 386-87, 458-60, 651, 673, 761, 765-66, 792-93, 979, 1016-18, 1034, 1092-93).

Although it might have been preferable for the ALJ to have given greater explanation of how or why these findings were inconsistent with Okonski's claimed functional limitations, the court finds the explanation was sufficient to permit the court to assess how the ALJ evaluated Okonski's subjective symptom complaints.  SSR 16-3p, 2016 SSR LEXIS 4 at *26.  And a review of the ALJ's reasons and discussion of the evidence allows us to conclude that the ALJ fulfilled her obligation to consider all the evidence and draw a reasonable conclusion regarding Okonski's RFC.  Simply put, the ALJ's analysis followed the framework set out in the regulations, was supported by substantial evidence, and was sufficient to draw and accurate and logical bridge between the evidence and the result.  *Fleischer*, 774 F. Supp. at 877; *Rogers*, 486 F.3d at 241; SSR 16-3p, 2016 SSR LEXIS 4; 20 C.F.R. § 416.920(e).

Accordingly, the ALJ's decision must be AFFIRMED.

**IV.     Conclusion**

      Because the ALJ applied proper legal standards in her evaluation of the medical source evidence and Okonski's physical subjective symptom complaints, the Commissioner's final decision denying Okonski's application for SSI must be and hereby is AFFIRMED.

**IT IS SO ORDERED.**

Dated: October 25, 2021

                                                  Thomas M. Parker
                                        United States Magistrate Judge